JAMES C. NIELSEN (111889)
 jnielsen@nkllp.law
DANIEL N. KATIBAH (293251)
 dkatibah@nkllp.law
NIELSEN KATIBAH LLP
100 Smith Ranch Road, Suite 350
San Rafael, California 94903
Telephone:  (415) 693-0900
Facsimile:  (415) 693-9674

Attorneys for Plaintiff
Wesco Insurance Company

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WESCO INSURANCE COMPANY, a Delaware corporation,<br><br>                    Plaintiff,<br>        v.<br><br>SENTRY INSURANCE COMPANY, formerly known as Sentry Insurance a Mutual Company, a Wisconsin Corporation,<br><br>                    Defendant.<br><br>_____<br><br>AND RELATED COUNTERCLAIMS. | No. 3:25-cv-07584-TSH<br><br>HON. THOMAS S. HIXSON<br><br>**WESCO'S NOTICE AND MOTION FOR SUMMARY JUDGMENT [F.R.Civ.P. Rule 56(a)]; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>Accompanying Documents:<br>DECL. OF JAMES C. NIELSEN (EXHS. A-D)<br>SEPARATE STATEMENT OF FACTS<br>PROPOSED ORDER<br><br>DATE: MARCH 26, 2026<br>TIME: 10:00 A.M.<br>COURTROOM: E |

TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ..... 1

INTRODUCTION ..... 2

STATEMENT OF FACTS ..... 2

ARGUMENT ..... 7

1.   Sentry covered Taylor for Taylor's liability arising out of the Alliance-made commercial washing machine. ..... 7

2.   Wesco's policy became excess over Sentry's in this "specific event or situation" where Taylor was sued for an injury arising out of Alliance's defective washing machine. ..... 9

3.   Sentry cannot show that its vendors endorsement's exclusions applied. ..... 11

   a.   Sentry has admitted that no evidence supported the claim of Taylor's negligence. ..... 11

   b.   Exclusion e. cannot apply because Sentry cannot show that Taylor ever "agreed" or "normally undertook" to perform particular work. ..... 14

   c.   Exclusion f. cannot apply because Sentry cannot identify any "operations … in connection with" the 1998 sale that Taylor conducted negligently. ..... 14

   d.   Taylor's negligence, if any there were, was not "independent" of the covered defect in Alliance's washing machine. ..... 16

   e.   Hutson's judgment based on a mixed cause of action is presumed covered. ..... 16

4.   By rejecting a reasonable statutory offer for entry of judgment, Sentry breached its duty to settle as a matter of law. ..... 17

5.   Sentry's allegation of failure of policy conditions fails under the insurer-breach rule. ..... 20

6.   By subrogation to Taylor's rights, Wesco may recover from Sentry the payment Wesco made to satisfy the Hutson judgment. ..... 23

CONCLUSION ..... 24

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Acceptance Ins. Co. v. Syufy Enters.*,
69 Cal.App.4th 321 (1999) .......... 7-10

*ACL Technologies, Inc. v. Northbrook Prop. & Cas. Ins. Co.*,
17 Cal.App.4th 1773 (1993) .......... 15

*Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) .......... 13

*Atain Spec. Ins. Co. v. Sierra Pacific Mgt. Co.*,
725 Fed.Appx. 557 (9th Cir. 2018) .......... 10

*Britz Fertilizers, Inc. v. Bayer Corp.*,
2009 WL 604940 (E.D. Cal. Mar. 9, 2009) .......... 13, 21

*Continental Cas. Co. v. City of Richmond*,
763 F.2d 1076 (9th Cir. 1985) .......... 7, 8

*Continental Cas. Co. v. St. Paul Surplus Lines Ins. Co.*,
803 F.Supp.2d 1113 (E.D.Cal.2011) .......... 21

*Credit Suisse First Bos. Mortg. Capital, LLC v. Danning, Gill, Diamond & Kollitz*,
178 Cal.App.4th 1290 (2009) .......... 15

*Crisci v. Security Ins. Co.*,
66 Cal.2d 425 (1967) .......... 22

*Critz v. Farmers Ins. Group*,
230 Cal.App.2d 788 (1964) .......... 22, 23

*Dua v. Stillwater Ins. Co.*,
91 Cal.App.5th 127 (2023) .......... 11, 14, 15

*Employers Ins. Co. of Wausau v. Lexington Ins. Co.*,
671 Fed.Appx. 552 (9th Cir. 2016) .......... 10

*Executive Risk Specialty Ins. Co. v. Rutter Hobbs & Davidoff, Inc.*,
2012 WL 12878754 (C.D. Cal. 2012) .......... 19

*Fireman's Fund Ins. Co. v. Maryland Cas. Co.*,
65 Cal.App.4th 1279 (1998) .......... 23

*Fuller–Austin Insulation Co. v. Highlands Ins. Co.*,
135 Cal.App.4th 958 (2006) ............................................................................................22

*Gray v. Zurich Ins. Co.,*
65 Cal.2d 263 (1966) ........................................................................................................17

*Greenman v. Yuba Power Prods*., Inc.,
59 Cal.2d 57 (1963) .......................................................................................................8, 12

*Hamilton v. Maryland Cas. Co.*,
27 Cal.4th 718 (2002) ......................................................................................................22

*Hartford Cas. Ins. Co. v. Travelers Indem. Co.*,
110 Cal.App.4th 710 (2003) .....................................................................................5, 9, 10

*Isaacson v. Cal. Ins. Guar. Assn.,*
44 Cal.3d 775 (1988) .......................................................................................................23

*Jamestown Builders, Inc. v. Gen. Star Indem. Co.*,
77 Cal.App.4th 341 (1999) ..............................................................................................22

*Harris v. County of Orange,*
17 F.4th 849 (9th Cir. 2021) ...............................................................................................7

*Lehto v. Allstate Ins. Co.*,
31 Cal.App.4th 60 (1994) ...................................................................................18-20, 24

*Minkler v. Safeco Ins. Co. of America,*
49 Cal.4th 315 (2010) ......................................................................................................11

*Mullins v. County of Fresno*,
2025 WL 2107572(E.D. Cal., July 28, 2025) ..................................................................13

*Northwestern Mut. Ins. Co. v. Farmers' Ins. Group*,
76 Cal.App.3d 1031 (1978) .............................................................................................23

*Peterson Tractor Co. v. Travelers Indem. Co. of Ill*.,
156 Fed.Appx. 21 (9th Cir. 2005) ................................................................................16-17

*Roche v. Hyde,*
51 Cal.App.5th 757 (2020) ..........................................................................................13, 21

*Schwartz v. State Farm Fire & Cas.Co.*,
88 Cal.App.4th 1329 (2001) ...................................................................................19, 20, 24

*Shell Oil Co. v. National Union Fire Ins. Co*.,
44 Cal.App.4th 1633 (1996) ...................................................................................6, 17-24

*Sidibe v. Sutter Health*,
103 F.4th 675 (9th Cir. 2024) .......... 13

*State Farm Mut. Auto. Ins. Co. v. Jacober,*
10 Cal.3d 193 (1973) .......... 14

*Swenson v. File,*
3 Cal.3d 389 (1970) .......... 7

*Teleflex Medical Inc.  v.  National Union Fire Ins.  Co.*,
851 F.3d 976 (9th Cir. 2017) .......... 22

*Terry v. Wasatch Advantage Group, LLC*,
2024 WL 3471297 (E.D. Cal., July 18, 2024) .......... 19

*United States v. Mirabal*,
98 F.4th 981 (9th Cir. 2024) .......... 13

*U.S. Fid. & Guar. Co. v. Lee Invs. LLC*,
641 F.3d 1126 (9th Cir. 2011). .......... 24

*Vandermark v. Ford Motor Co.*,
61 Cal.2d 256 (1964) .......... 8, 12

*Wade v.  Southwest Bank*,
211 Cal.App.2d 392 (1962) .......... 21

*Westport Ins. Co. v. Cal. Casualty Mgt. Co.*,
916 F.3d 769 (9th Cir. 2019) .......... 24

*Wisper Corp. v. California Commerce Bank*,
49 Cal.App.4th 948 (1996) .......... 24

Statutes and Rules

28 U.S.C.§ 1335 .......... 6

28 U.S.C. §2201 .......... 1, 25

28 U.S.C. §2202 .......... 1

F.R.Civ.P. Rule 22 .......... 6

F.R.Civ.P. Rule 56 .......... 1

Local Rule 7-2 .......... 1

Cal. Civ. Code § 1589 .......... 21

Cal. Civ. Code § 3287                                                                    24

Cal. Civ. Code § 3289                                                                    24

Cal. Civ. Code § 3516                                                                    21

Cal. Code Civ. Proc. § 998                                              3, 5, 11, 14, 23

Treatises

Croskey, et al.,
Cal.  Practice Guide: Insurance Litigation (Rutter 2025)                  22

## **NOTICE OF MOTION AND MOTION**

On March 26,  2026, at 10:00 a.m. in the United States District Court for the Northern District of California, Courtroom E, located at 450 Golden Gate Avenue, San Francisco, California 94102, plaintiff Wesco Ins. Co. will and does move for an order under F.R.Civ.P. Rule 56 and Local Rule 7-2 granting summary judgment in its favor and against defendant Sentry Ins. Co.

The motion is made on the bases that Wesco and Sentry both insured a business called Taylor Houseman, Inc., which was sued in an underlying action; that Sentry's policy covered Taylor as primary insurance and Wesco's as excess insurance; that a reasonable offer for entry of judgment was made and later a money judgment of just under $2 million was entered against Taylor; that Sentry refused to agree to the offer or to pay any part of the judgment against Taylor and thereby breached its duties of settlement and indemnity to Taylor; and that Wesco therefore paid its $1 million policy limit toward satisfying the underlying money judgment against Taylor and is subrogated to Taylor's rights against Sentry.  Wesco is thus entitled to a money judgment against Sentry on Wesco's first and second claims (ECF 1) for breach of contract and of the implied covenant of good faith (both in subrogation to Taylor's rights) in the amount of $1 million, plus prejudgment interest from September 12, 2025, when the underlying judgment was paid.

In the event Sentry raises points of calculation, allocation, or other issues that in the Court's view preclude summary judgment in full, Wesco alternatively requests partial summary judgment under Rule 56(a) on the issues of liability and priority of insurance both under Wesco's first and second claims referenced above, and also under Wesco's third claim for declaratory judgment under 28 U.S.C. §§2201 and 2202 (ECF 1) and under the third claim for declaratory judgment in Sentry's counterclaim (ECF 29).  The Court's discretion under §§2201 and 2202 permit the Court to settle the legal relations in issue, afford complete relief, and terminate this matter.

The motion is based upon the following memorandum, the separate statement of facts per the Court's tentative CMC order (ECF 38, p. 2) following the parties meet-and-confer as to same (Nielsen decl. ¶14), and "to particular parts of materials in the record" under Rule 56 (c)(1)(A) including portions of Sentry's answer (ECF 28) and counterclaim (ECF 29), Wesco's request for judicial notice (ECF 19-1), the declaration of James C. Nielsen (with exhibits A-D) filed herewith.

**INTRODUCTION**

The core issues in this action are largely summarized in the notice above and were partially framed in Sentry's earlier motion to dismiss (ECF 12), which the Court denied.  (ECF 26.) Plaintiff Wesco has alleged, and will establish below, that these insurers' common insured, Taylor Houseman, Inc., was sued in an underlying state-court action alleging bodily injuries, that as to the underlying action Sentry insured Taylor on a primary basis and Wesco did so on an excess basis, and that Sentry's improper refusal to approve acceptance of a statutory offer for entry of judgment or to pay the resultant money judgment forced Wesco to advance its $1 million limit.  Wesco now proceeds in subrogation to Taylor's rights against Sentry to recover Wesco's payment.

Sentry's refusal to protect Taylor stemmed from two basic mistakes.  <u>First</u>, Sentry insured Taylor as an additional insured on a "vendors endorsement" for those who sold commercial washing machines made by Sentry's named insured, Alliance Laundry Systems, LLC.  Sentry mistakenly argued then and now that it could not pay money for Taylor without obtaining a release for Alliance, even though Alliance had another $25 million in available coverage from Federal Ins. Co.  California case law confirms this extensive additional coverage both rendered nugatory Sentry's insistence on releasing Alliance and required Sentry to instead protect Taylor.

<u>Second</u>, Sentry invoked limited exclusions in its vendors endorsement, relating to specified vendor negligence, to claim Taylor's liability was uncovered.  But Sentry knew from the start that no evidence existed to support those exclusions, and the exclusions in any event by their narrow terms could not have applied as a matter of law.

Even after Wesco had satisfied the judgment against Taylor and filed this suit, Wesco urged Sentry to simply interplead its limits into this Court and avoid additional liability.  Instead, Sentry paid out its limits to settle for Alliance and protect Alliance's excess insurer, Federal.

**STATEMENT OF FACTS**

The facts here are relatively simple and largely before the Court in Sentry's answer (ECF 28), attachments to Sentry's counterclaim (ECF 29) and in Wesco's earlier request for judicial notice (ECF 19-1).  They are supplemented modestly by the declaration and four exhibits filed with this motion.  The facts are also summarized in the separate statement of facts filed concurrently.

Jaurice Hutson brought the underlying state-court lawsuit alleging injuries he suffered in 2019 when his arm was caught in a commercial washing machine's drum, which was spinning while the washer's door was open.  In Hutson's operative amended complaint (Fact 1, see ECF 29, Exh. C), he sued both Alliance (which manufactured the machine in 1998), and Taylor (the vendor that sold the machine and occasionally serviced it in the following two decades).  (Fact 2, ECF 29, p. 339 of 477, ¶¶ 1, 3.)  Hutson asserted four claims against both Alliance and Taylor for (l) strict products liability, (2) negligence, (3) breach of warranty, (4) exemplary damages.  (Fact 3.)

Hutson's first 77 paragraphs over 15 pages railed about the manifest defects in Alliance's machine.  (Fact 4.)  He focused on "the interlock, which is the most important safety feature" of Alliance's machine (Fact 4, see, ECF 29, p. 340 of 477, ¶6) and "the interlock system, which is the system designed to prevent arm amputations" (Fact 4, ECF 29,  p. 341, ¶10), and the fact that "ALLIANCE knows that if the interlock is not durable, fails, and does not withstand the number of cycles the product undergoes, an individual can suffer an arm amputation, serious injury or death." (Fact 4, ECF 29, p. 342, ¶22.)  During an Alliance "test, a vital part of the interlock … broke," but "ALLIANCE did nothing to retest the product or warn owners of the UW model line that the interlock may break if used for longer than ten years."  (Fact 4, ECF 29, p. 342-43, ¶24.)  Alliance could have "prevented [Hutson's] injury by learning that this specific model has an interlock with durability problems and has insufficient warnings to users related [to] putting their arm/hand into the spinning basket."  (Fact 4, ECF 29, p. 344, ¶ 33.a.)  As far back as 1998 Alliance's engineers "determined that the washing machines being sold at the time, were not durable, were subject to tampering and/or improper servicing, and that the interlock …needed to be improved to 'reduce the risk that the appliance door will be opened during operation of the appliance.'"  (Fact 4, ECF 29, p. 350, ¶ 51.)  Alliance's own engineers "determined the design of an interlock should have several key components" that the machine here lacked.  (Fact 4, ECF 29, p. 350, ¶ 52.)  But Alliance even "designed the machine so that individuals could easily bypass the interlock, allowing the door to open during a cycle, which is a highly dangerous occurrence."  (Fact 4, ECF 29, p. at 351, ¶62.)

Hutson also alleged, against both Alliance and Taylor, that "the subject washing machine was poorly maintained for 20 years." (Fact 4, ECF 29, p. 354 of 477.)  Hutson theorized that, when

the accident occurred, "important nuts, which are a part of the interlock system, were missing," leading Hutson to conclude that the "washing machine was in this condition because of its poor design, which was exacerbated by numerous years of deficient maintenance." (Fact 4, ECF 29, p. 339 of 477, ¶¶ 78-79.)

At the time of Hutson's accident, Alliance had a policy of primary general liability insurance with $2 million in contractual limits issued by Sentry. (Fact 5, ECF 29, Exh. A.) Above Sentry, Alliance had an excess liability policy issued by Federal Ins. Co. with $25 million in limits. (Fact 8, ECF 28 ¶11, admitting complaint ECF 1 ¶11.)

Sentry's primary policy attached an "Additional Insured – Vendors" endorsement that expanded Sentry's coverage to include as insureds those who had sold Alliance's products, as follows:

> Any person or organization…shown in the Schedule, but only with respect to **'bodily injury'** or 'property damage' **arising out of 'your products'** shown in the Schedule which are distributed or sold in the regular course of the vendor's business, subject to the following additional provisions…

(Fact 9, ECF 29, Exh. A, p. 39 of 477, emph. added.) The referenced Schedule listed "all vendors of your products domiciled in the United States of America or Canada." (*Id.*)

Because Taylor had sold Alliance's washing machine 20 years earlier, Sentry agreed to defend Taylor under the endorsement. Sentry reserved rights citing a handful of exclusions to the endorsement, including one for failure to provide services a vendor "agreed to make" and certain servicing "operations," both "in connection with the sale" itself (Fact 10, ECF 29, Exh. D., pp. 364 & 369 of 477); these are addressed in more detail in the discussion within.

The same letter informed Taylor that Sentry had both "retained" and "chosen Amber L. Kelly at the Walsworth firm" to defend Taylor. (Fact 10, ECF 29, p. 365 of 477.) And "the Sentry claims adjuster who supervised the defense counsel Sentry hired to defend Taylor Houseman [Ms. Kelly] also supervised the separate defense counsel Sentry hired to defend Alliance Laundry." (Fact 11, ECF 28 ¶13, admitting, ECF 1 ¶13.)

Under Sentry's supervision, attorney Kelly moved for summary judgment, supporting her motion with a separate statement of undisputed facts. (Fact 12, ECF 19-1 [req. jud. notice], Exh.

A.)  Ms. Kelly's evidence showed that Taylor had "provided maintenance when requested" but had stopped doing so months before Hutson's accident because Hutson's employer, which owned the machine, stopped paying.  (Fact 12, see, ECF 19-1 p. 5-6 of 19.)  Ms. Kelly laid out the undisputed facts disproving Hutson's second claim for negligence as it related to maintenance.  (Fact 12, ECF 19-1, pp. 8-11 of 19.)  Ms. Kelly's statement showed that no one had produced evidence that Taylor's ad hoc "maintenance of the subject machine was deficient [or] that said maintenance caused the incident" (Fact 12, ECF 19-1, p. 10 of 19, line 14), nor evidence of any "facts, documents or information which support his claim that [Taylor] negligently maintained the subject machine." (Fact 12, ECF 19-1, p. 11 of 19, line 14.)  (Ms. Kelly's evidence is further discussed in the argument that follows.)

Meanwhile, however, Taylor was required to respond to an offer from Hutson for entry of judgment to be taken against Taylor under Cal. Code Civ. Proc. § 998, in the amount of $1,999,999.99—less than Sentry's stated $2 million policy limit.  (Fact 13, ECF 29, p. 394 of 477.) In her pretrial report of August 6, 2025, Ms. Kelly advised Sentry that Hutson's case had a value between $8 million and $12 million and that Taylor's liability to Hutson likely exceeded Hutson's statutory offer.  (Fact 14,  Nielsen decl. ¶ 6.)

Hutson kept the offer open until August 12, 2025.  (Fact 13, see ECF 19-1, p. 18 of 19 [letter].)  On August 7, 2025, Wesco through counsel thus demanded that Sentry accept the offer to protect Taylor.  (Fact 15, ECF 19-1, p. 18 of 19.)  Wesco noted that "based on the consistent terms of the Sentry and Wesco polic[ies], Sentry affords primary coverage to Taylor Houseman and Wesco excess coverage." (*Id.*, citing *Hartford Cas. Ins. Co. v. Travelers Indem. Co*., 110 Cal.App.4th 710 (2003).)  Wesco acknowledged that "Sentry's named insured, Alliance, also is a defendant in the Hutson action and may wish to proceed to trial," but noted that Alliance had "an additional $25 million in insurance available from Federal Insurance in excess of Sentry's policy, and so appears to be fully protected in connection with the Hutson action." (*Id.*, p. 19.)  Wesco added that, if "Sentry contends that its limits have been impaired in any amount, please share evidence of such impairment, so that Wesco can consider making up the difference between such impairment and the statutory offer." (*Id*.)

The next day, August 8, 2025, Sentry's counsel rejected Wesco's demand, citing allegations of Taylor's negligence and claiming that Sentry "cannot settle an action without a release of all insureds," including its named insured, Alliance.  (Fact 16, Nielsen decl. Exh. A [letter].)  On August 9, counsel for Wesco responded that the cited theory applies only when, "had the insurer accepted the plaintiff's offer, 'it would have left one of its insureds bereft of coverage'" whereas Alliance's additional $25 million in protection from Federal rendered the theory inapplicable. (Nielsen decl. Exh. B, quoting *Shell Oil Co. v. Nat'l Union Fire Ins. Co*., 44 Cal.App.4th 1633, 1646 (1996).)

Sentry never withdrew its refusal of Hutson's offer, so Wesco committed its limits to satisfy the judgment.  (Facts 16, 17, Nielsen decl. ¶ 10.)  At no time did Sentry, which supervised and controlled Ms. Kelly, direct her not to sign the offer for entry of judgment.  On the August 12 deadline, Ms. Kelly therefore signed the acceptance of the statutory offer (Fact 18, ECF 29, p. 395 of 477); on August 21, the court entered a money judgment of $1,999,999.99 against Taylor (Fact 19, ECF 29, p. 392 of 477); and on September 12, Hutson's counsel filed an acknowledgment of satisfaction (payment) of the judgment in full.  (Fact 21, ECF 19-1, p. 15 of 19.)

Meanwhile, on September 3, 2025, Alliance's counsel (also supervised by the same Sentry adjuster) served a statutory offer to permit entry of judgment against Alliance in the amount of $3 million (Fact 20, Nielsen decl. Exh. C), thereby committing Sentry's full limits (listed at $2 million) to Alliance alone.

On September 5, Wesco filed the current action to recoup its $1 million payment from Sentry.  (ECF 1.)  Wesco's counsel then suggested that Sentry interplead its limits into court under 28 U.S.C.§ 1335 or F.R.Civ.P. Rule 22 to extricate itself from liability.  On September 24, 2025, counsel emailed Sentry attorney Laura Ramos and inquired: "I had suggested to Lynette [Klawon] that Sentry interplead its limits and wash its hands of this matter, but I never heard back. Has Sentry decided against that remedy?"  (Fact 22, Nielsen decl., ¶12, Exh. D.)  Sentry has never responded.  (*Id.*)

On October 6, Hutson's counsel informed Wesco's that Alliance (through Sentry and Federal) had settled with Hutson for an additional $3.6 million.  (Fact 23, Nielsen decl. ¶13.)

## ARGUMENT

**1.      Sentry covered Taylor's liability arising out of the Alliance-made commercial washing machine.**

The policy Sentry issued to Alliance covered Alliance's vendors like Taylor for all "'bodily injury' … arising out of 'your [Alliance's] products' …" (Sentry Counterclaim, ECF 29, Exh. A, p. 39 of 477.)  The key causative term "arising out of" is identical to that in the additional-insured provision addressed in *Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal.App.4th 321 (1999), a seminal case confirming that the phrase extends coverage to an additional insured (here, Taylor) based on a "minimal causal connection or incidental relationship" with the operations of the named insureds (here, Alliance).  *Id* at 328.

The *Syufy* court drew this principle from the Ninth Circuit's decision in *Continental Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1081 (9th Cir. 1985), where the court held that the "arising out of" language in the context of a policy exclusion meant that "a claim need be only slightly connected to one of the types of injury that is specifically identified for exclusion."  For decades insurers underwriting in California have known of the holdings in *City of Richmond* and *Syufy*, and "all applicable laws in existence when an agreement is made … necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." *Harris v. County of Orange,* 17 F.4th 849, 866 (9th Cir. 2021), quoting *Swenson v. File,* 3 Cal.3d 389, 393 (1970).  Sentry's decision to frame Taylor's insured status with the phrase "arising out of" means any plausible connection to the covered activity of Alliance selling its washing machine disposes of the issue here.

*Syufy* illustrates why this is so.  There, a building owner hired a contractor and the contractor's employee suffered injuries while using a negligently maintained roof hatch.  69 Cal.App.4th at 324.  The contractor's policy made the owner an additional insured "with respect to liability arising out of" the contractor's work.  *Id*.  When the employee sued the owner for negligence, the owner tendered its defense to the contractor's insurer. The insurer discovered that none of the contractor's employees, including the plaintiff, had worked on the hatch, that the plaintiff was not performing work duties when the accident occurred, and that the owner "had

known for several years that the hatch was defective." *Id.* at 324-25. The insurer sued the owner for a declaration of non-coverage, arguing that the owner's negligence, not the plaintiff's presence on the roof, caused the injury.

Embracing *City of Richmond*, the *Syufy* court concluded that the contractor's policy required "only a minimal causal connection or incidental relationship" with the contractor's work to cover the owner. *Id.* at 328. The court concluded that the employee's injury "clearly 'arose out of' the work he was performing on the roof of [the owner's] building." *Id.* The employee "could not have done the job without passing through the hatch," making the causal relationship between the hatch and the job "more than incidental." *Id.*

The *Syufy* court likewise rejected each of the insurer's three theories of non-coverage. *Id.* at 326. It made no difference that the contractor did no work on the hatch, that the owner alone "had known for several years that the hatch was defective," *id.* at 325, or that the injury was "attributable solely to [the owner's] negligent maintenance." *Id.* at 327. The injury was "more than incidental" to the work because the employee used the hatch to get to his job. *Id.* at 328. Nor did it matter that the owner's "sole" negligence caused the injury because the "arising out of" phrase rendered fault legally "irrelevant." *Id.*

So here. Under *Syufy* all that was needed for Alliance's endorsement to cover Taylor was an incidental or slight relationship between Hutson's injuries and Alliance's washing machine.

That connection is manifest. As discussed, Hutson's complaint largely focused on the machine's "interlock, which is the most important safety feature" of Alliance's machine (Sentry counterclaim, ECF 29, Exh. C, p. 340 of 477, ¶6; see also ¶¶ 10, 22, 24, 33.a, 51, 52, 62.) The complaint thus largely sounds in strict products liability against Alliance as a manufacturer. (ECF 29, Exh. C, pp. 354-359 of 477.) "A manufacturer is strictly liable in tort when an article he places on the market ... proves to have a defect that causes injury ...." *Greenman v. Yuba Power Prods.*, Inc., 59 Cal.2d 57, 62 (1963). Hutson added Taylor to each of these claims because Taylor was vicariously liable for retailing Alliance's defective machine. *Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 263 (1964) ("Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff").

As to Hutson's allegations of negligent maintenance, Hutson theorized that, when the accident occurred, "important nuts, which are a part of the interlock system, were missing," leading Hutson to conclude that the "washing machine was in this condition because of its poor design, which was exacerbated by numerous years of deficient maintenance." (ECF 29, Exh. C, p. 339 of 477, ¶¶ 78-79.) In other words, Hutson alleged no negligence independent of the defect in Alliance's machine, but that Alliance or Taylor failed to prevent the defect from injuring Hutson.

Taylor's liability far outstripped the "incidental" connection to Alliance's defective machine required by *Syufy*. Alliance's defects were inextricably intertwined with any and every theory of liability against Taylor. Hutson's lawsuit plainly triggered coverage for Taylor under Sentry's endorsement.

**2.    Wesco's policy became excess over Sentry's in this "specific event or situation" where Taylor was sued for an injury arising out of Alliance's defective washing machine.**

Wesco's and Sentry's policies both contain an "Other Insurance" condition declaring their policies excess over:

> Any other primary insurance available to you covering liability for **damages arising out of** the premises or operations, or **the products** and completed operations, for which you have been added as an additional insured.

(ECF 29, p. 179 of 477 [Wesco policy], emph. added; *Id.* p. 30 of 477 [Sentry policy].)

These identical clauses do not conflict. Each instead elevates the respective policy to excess status where the parties (the insurer and named insured) explicitly agreed that it would— where "the insured is covered as an additional insured on another party's policy for some specific event or situation." *Hartford Cas. Ins. Co. v. Travelers Indem. Co.*, 110 Cal.App.4th 710, 727 (2003). Under *Hartford,* the plain terms of Sentry's policy made Sentry Taylor's sole primary insurance for Taylor's liability to Hutson, which arose from Alliance's products.

*Hartford* involved a dispute between a landlord's insurer, Travelers, and a tenant's insurer, Hartford, about an underlying wrongful-death lawsuit. The lawsuit arose after one of the tenant's employees fell to his death from a third-floor exterior deck on the leased premises. *Id.* at 713. Travelers tendered the landlord's defense to Hartford based on an additional-insured provision in the Hartford policy. *Id.* As here, both the Travelers and Hartford policies contained functionally

the same excess "other insurance" clause. The Travelers clause made its coverage excess to "valid and collectible insurance available to [the landlord] if you are added as an additional insured under any policy." *Id. at* 726. The Hartford clause similarly applied "when [the tenant] was an additional insured under another policy." *Id. at* 726. Hartford accepted the landlord's defense under a reservation of rights and sued Travelers for declaratory relief, and Travelers cross-complained. *Id.* at 716. The trial court found that Travelers' policy applied in excess to Hartford's. *Id.*

The appellate court affirmed because "the policies in this case contain narrow exceptions to their operation as primary insurance. There are no broad 'excess only' clauses in either policy that purport to make the coverage excess whenever there is other insurance." *Id. at* 726. "Both policies declare themselves to be excess in the situation where the parties and the insurers are most likely to intend that result—when the insured is covered as an additional insured on another party's policy for some specific event or situation." *Id.*; accord, *Atain Spec. Ins. Co. v. Sierra Pacific Mgt. Co.*, 725 Fed.Appx. 557, 559 (9th Cir. 2018) ("in California, excess insurance clauses in otherwise primary insurance policies may be enforceable in the limited circumstance of a narrow clause declaring the policy 'to be excess in the situation where the parties and the insurers are most likely to intend that result—when the insured is covered as an additional insured on another party's policy for some specific event or situation.'"); *Employers Ins. Co. of Wausau v. Lexington Ins. Co.*, 671 Fed.Appx. 552, 552-553 (9th Cir. 2016) (same).

So here. Indeed, the reciprocal "excess" clauses in Sentry's and Wesco's policies are *stronger* than those in *Hartford*. The *Hartford* policies were excess merely when the named insured was "added as an additional insured under any other policy." 110 Cal.App.4th at 715. Both insurers' forms here specifically render Sentry primary and Wesco excess for all liability "**arising out of** … the products … for which you [Taylor] have been added as an additional insured." (ECF 29, pp. 30 and 179 of 477.) In other words, Wesco's very status as excess and Sentry's status as primary for Taylor applies whenever—as was the case in Hutson's lawsuit— Taylor's liability has a "minimal causal connection or incidental relationship" with Alliance's machine. *Syufy,* 69 Cal.App.4th at 328. As to Hutson's action, then, Sentry's policy was primary and Wesco's excess as a matter of law.

**3.     Sentry cannot show that its vendors endorsement's exclusions applied.**

Sentry's endorsement states that "the insurance afforded the vendor does not apply to" a half dozen categories of liability-inducing conduct listed as exclusions a-g.  (ECF 29 at 4.)  Sentry invokes two, e. and f., to argue Taylor lacked coverage for Hutson's lawsuit (ECF 29 at 5, ¶¶ 19, 20):

> e.     Any failure to make inspections, adjustments, tests or servicing as the vendor has **agreed to make or normally undertakes** to make in the usual course of business, **in connection with the distribution or sale** of the products;
>
> f.     Demonstration, installation, servicing or repair **operations**, except such operations performed at the vendor's premises **in connection with the sale** of the product; …  (Emph. added.)

Sentry has characterized these as barring coverage for Taylor's "independent negligence." (*Id.* ¶ 21; ECF 12 at 6.)  But Sentry cannot show any "negligence" by Taylor, let alone any negligence "independent" of the defects in Alliance's washing machine.  Nor, in any event, can Sentry show that any of Hutson's theories actually could have fallen within the stated, narrow elements of exclusions e. or f.

**a.     Sentry has admitted that no evidence supported the claim of Taylor's negligence.**

No one disputes that Taylor serviced Alliance's machine from time to time after its sale in 1998 until a point some seven months before Hutson's injury.  (ECF 19-1 [Taylor statement of facts], Exh. A, facts 3-5, pp. 5-6 of 19).  Based on this, Hutson alleged that "the subject washing machine was poorly maintained for 20 years." (See, ECF 29 Exh. C at 19.)

Sentry has of course conceded that, in the first instance, Taylor qualified as its additional insured.  (ECF 29 p. 5 ¶ 16.)  Once coverage is established in the first instance, "the burden is on the insurer"—Sentry— "to show the claim falls within an exclusion to coverage, and exclusions are narrowly construed."  *Dua v. Stillwater Ins. Co.*, 91 Cal.App.5th 127, 136 (2023) (cit. omitted); see *Minkler v. Safeco Ins. Co. of America,* 49 Cal.4th 315, 322 (2010) (Sentry "has the burden of establishing that a specific exclusion applies").  Sentry cannot meet that burden merely by citing Hutson's single, unsubstantiated allegation of negligence.  Sentry must instead adduce evidence of

Taylor's supposedly negligent conduct within Sentry's exclusions.  (ECF 29, p. 39 of 477 [endorsement].)  Sentry cannot do this because such evidence does not exist.

To start with, Hutson's basic allegations against Alliance (as manufacturer under *Greenman,* 59 Cal.2d at 62) and Taylor (as seller under *Vandermark,* 61 Cal.2d at 263) alike were those of strict products liability based on the sale of a defective commercial washing machine. Those allegations are not excluded.

As to allegations of negligence, no evidence exists, as confirmed by defense counsel Amber Kelly.  Recall that Sentry had "chosen" Ms. Kelly to defend Taylor (ECF 29, Exh. D, p. 365 of 477), then "retained" her (ECF 12 at 4:19), then "controlled" (*id.* at 18:19) and "supervised" Ms. Kelly.  (ECF 28 [answer], p. 4, ¶13, admitting complaint, ECF 1 ¶13.)  Under Sentry's supervision, Ms. Kelly moved for summary judgment, supporting her motion with a separate statement of undisputed facts under Cal. Code Civ. Proc. §437c.  (ECF 19-1, Exh. A.)  There, Ms. Kelly laid out the undisputed facts disproving Hutson's second claim for negligence as it related to maintenance. (*Id.,* pp. 8-11 of 19.)  Ms. Kelly acknowledged that Taylor had been hired by Hutson's employer periodically to perform maintenance, but:

- that "when [Taylor] was performing preventative maintenance, the washing machines were operating as expected" (*id*. fact 4),

- that Taylor had not maintained the machines for many months before the accident because Hutson's employer had stopped payments (*id*., fact 5),

- that, only "after monthly maintenance stopped, the subject machine started to experience problems" (*id*., fact 7),

- that Hutson himself then complained to his employer about the machine (*id*., fact 8),

- that the employer then learned that employees had used objects "to force the handle of the machine into a tighter position so the cycle could operate" (*id*., fact 9),

- that Hutson had produced no evidence that Taylor's "maintenance of the subject machine was deficient [or] that said maintenance caused the incident" (*id*., fact 11),

- that Hutson could not connect "discovery of a missing screw, during an inspection of the machine which took place 2 years after the incident," to anything Taylor did (*id*., fact 12),

and

- that Hutson had "produced no specific facts, documents or information which support his claim that [Taylor] negligently maintained the subject machine." (*Id.*, fact 14.)

In other words, the defense attorney Sentry hired produced evidence showing there was nothing to Hutson's add-on theory of negligent maintenance.

Importantly, these statements of fact were made by the attorney Sentry admits that it "chose[]," "retained," "control[ed]," and "supervised" to defend Taylor. It is axiomatic that "an attorney retained by an insurance company to defend an action against its insured represents both the insurance company and the insured." *Britz Fertilizers, Inc. v. Bayer Corp.*, 2009 WL 604940 *2 (E.D. Cal. Mar. 9, 2009) (cits. omitted). "[A]n attorney is his client's agent, and ... the agent's knowledge is imputed to the principal …." *Roche v. Hyde,* 51 Cal.App.5th 757, 797 (2020) (cits. & quots. omitted.) As such, these statements by Sentry-hired defense counsel amount to evidentiary admissions admissible under F.R.E. Rule 801(d)(2); see, *Sidibe v. Sutter Health*, 103 F.4th 675, 701 (9th Cir. 2024) (noting that "Sutter's own admissions" through its agents "would have had more persuasive force than other evidence."), citing *United States v. Mirabal*, 98 F.4th 981, 982-983 (9th Cir. 2024) ("the sworn statement of a government attorney in a plea agreement or sentencing memorandum is a party admission").

Even more, these summary-judgment statements of undisputed facts bind Sentry as judicial admissions. *Mullins v. County of Fresno*, 2025 WL 2107572 fn. 13 (E.D. Cal., July 28, 2025) (construing factual contention in an "opposition to defendants' first motion for summary judgment" as "a judicial admission"), citing *Siam Numhong Prods. Co. v. Eastimpex*, 866 F. Supp. 445, 450 (N.D. Cal. 1994) ("A judicial admission may be contained in a statement of undisputed facts …."), see also *Terry v. Wasatch Advantage Group, LLC*, 2024 WL 3471297 *8 (E.D. Cal., July 18, 2024) (same); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) ("statements of fact contained in a brief may be considered admissions of the party").

As a matter of law, these binding admissions of fact by counsel chosen, retained, controlled, and supervised by Sentry bar Sentry from now contending that Taylor faced any plausible liability to Hutson for negligence. Taylor's only liability was that of products liability fully covered by the

Sentry policy's vendors endorsement.

### b. Exclusion e. cannot apply because Sentry cannot show that Taylor ever "agreed" or "normally undertook" to perform particular work.

Even if Sentry were not barred from claiming negligence by Taylor, its contention would still fail to meet Sentry's "burden … to show the claim falls within an exclusion to coverage," mindful that "exclusions are narrowly construed." *Dua*, 91 Cal.App.5th at 136. This "burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." *State Farm Mut. Auto. Ins. Co. v. Jacober,* 10 Cal.3d 193, 201-02 (1973).

Sentry relies first on exclusion e., which exempts "failures" to perform "inspections, adjustments, tests or servicing" but only those "the vendor has **agreed to make** or **normally undertakes** to make in the usual course of business, in connection with the distribution or sale of the products**." (ECF 29, p. 39 of 477, emph. added.) Sentry, then, would need to produce evidence that Taylor "agreed to" or "normally undertakes" to make such inspections, and did so "in connection with" the 1998 sale of the Alliance machine, before Sentry can raise this exclusion.

Sentry cannot. Neither Hutson's employer (which owned the machine) nor Taylor "agreed" to any particular maintenance because the employer never contracted with Taylor. Taylor instead provided service on an as-needed basis only on request. (ECF 19-1, Exh. A. at 2-3). This relationship ended when Shields stopped paying its bills over seven months before the accident. (*Id.*) Sentry cannot offer evidence to show (a) which work caused Hutson's injury; (b) any occasion where Taylor agreed to perform this work yet failed to do so; (c) that Taylor ordinarily performed this work yet failed to do so; or (d) that Taylor's imagined failure occurred "in connection with the sale or distribution" of a machine sold 20 years earlier.

Exclusion e., which must be construed narrowly and supported by facts, cannot impede Sentry's coverage for Taylor and cannot rebut Wesco's motion for summary judgment.

### c. Exclusion f. cannot apply because Sentry cannot identify any "operation" in "connection with" the 1998 sale that Taylor conducted negligently.

Sentry's exclusion f. applies to "demonstration, installation, servicing or repair operations … in connection with the sale." (ECF 29, p. 39 of 477). Note that Sentry's exclusion did not

simply exclude service, but only "operations" involving service "in connection with the sale." (*Id.*)

These modifiers matter and must be given meaning. *ACL Technologies, Inc. v. Northbrook Prop. & Cas. Ins. Co.,* 17 Cal.App.4th 1773, 1785 (1993) ("contracts—even insurance contracts—are construed to avoid rendering terms surplusage"); see Cal. Civ. Code § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"].) In turn, the term "operations" in common usage connotes systematic, ongoing business activities rather than isolated, occasional responses to customer requests. E.g., Merriam-Webster def. 2.c. ("a method or manner of functioning");[1] American Heritage defs.1, 3 (the "process of operating or functioning" or a "process or series of acts involved in a particular form of work: *the operation of building a house*.")[2]

Consistent with this view, and mindful again that "exclusions are narrowly construed," *Dua*, 91 Cal.App.5th at 136, when Sentry's endorsement lists "demonstration, installation, servicing or repair operations," it groups activities that typically represent planned, organized business functions "in connection with the sale" of the machine. That grouping matters as well because "a word takes meaning from the company it keeps." *Credit Suisse First Bos. Mortg. Capital, LLC v. Danning, Gill, Diamond & Kollitz*, 178 Cal.App.4th 1290, 1298 n.6 (2009) (applying the interpretive rule *noscitur a sociis*).

Thus, had Sentry meant to exclude *any* servicing activity, the words "operations … in connection with the sale" would have been meaningless. Legally, however, they must be given effect. And here, the only evidence suggests that decades after the sale, Taylor was called on a sporadic basis to service one or more machines, which differs fundamentally from conducting "servicing or repair operations" as any regular business function. And Sentry can adduce **no** evidence that any of Taylor's "operations," as distinct from sporadic service calls, non-routine assistance, customer accommodation, or incidental support, were in any way "connect[ed] with the sale" of Alliance's defective machine.

---

[1] https://www.merriam-webster.com/dictionary/operation.
[2] https://ahdictionary.com/word/search.html?q=operations

**d.    Taylor's negligence, if any there were, was not "independent" of the covered defect in Alliance's washing machine.**

From the outset, Sentry has suggested that exclusions e. and f. create a broad carveout of coverage for "independent negligence" of Alliance's vendors.  (ECF 29, at 5.)  Yet the term "independent negligence" appears nowhere in Sentry's endorsement and Sentry has offered nothing supporting its theory that two exclusions that address specific uncovered acts or omissions somehow combine to create a blanket carveout for "independent negligence."

But even if Sentry could make those showings, the exclusions **still** could not apply because Taylor's alleged negligence legally could not be divorced from the defects in Alliance's machine.  As discussed under point 1, *ante*, Hutson's theory of negligent maintenance was that, when the accident occurred, "important nuts, which are a part of the interlock system, were missing," and the "washing machine was in this condition **because of its poor design**, which was exacerbated by numerous years of deficient maintenance."  (ECF 29, Exh. C , p. 339 of 477,  ¶¶ 78-79, emph. added.)  In fact, Hutson claimed the machine was defective **because** it required excessive maintenance to keep all of its nuts in place.  "Designing and selling a product [Alliance] knew would be used for 20-plus years that requires **daily** maintenance of the most important safety feature is a de facto defective design."  (ECF 12-1 Exh. C at 15 [emph. orig.)  Hutson compared this "to requiring owners of motor vehicles to maintain their brakes daily."  (*Id.*)

In other words, Hutson alleged only that Taylor failed to prevent the Alliance-caused defect from causing injury to Hutson.  Even if Hutson's allegations could have been proven—and they could not—by their terms the negligence allegations were inseparable from the defect in Alliance's machine expressly covered by Sentry's vendors endorsement.  Sentry's made-up contention about "independent negligence" can go nowhere.

**e.    Hutson's judgment based on a mixed cause of action is presumed covered.**

Where, as here, a money judgment has been entered against an insured without specifying excluded damages, an insurer in Sentry's position is liable for the judgment in full.  "In a mixed cause of action, where it is unclear whether a judgment was based on covered or uncovered claims, the insurer is liable for the entire judgment."  *Peterson Tractor Co. v. Travelers Indem. Co. of Ill.*,

156 Fed.Appx. 21, 24 (9th Cir. 2005), citing *Gray v. Zurich Ins. Co.,* 65 Cal.2d 263 (1966).

As discussed earlier, Hutson's complaint spoke to Alliance's defective product and any suggestion of negligence arose from that defect. Hutson's statutory offer of judgment specified no discrete award under a negligence theory separate from the products-liability theory. Thus, even if Sentry could establish negligence—and it cannot—Sentry could not show that any portion of the money judgment was allocated to negligence. *Peterson Tractor Co., supra.* Instead, as a matter of law, "the insurer [Sentry] is liable for the entire judgment." *Id.*

4.  **By rejecting a reasonable statutory offer for entry of judgment, Sentry breached its duty to settle as a matter of law.**

Wesco's basic theory for recoupment of its $1 million settlement contribution from Sentry depends only on establishing that Sentry breached its contractual duty to pay the money judgment against Taylor in Hutson's lawsuit. Such a recovery was illustrated in *Shell Oil Co. v. Nat'l Union Fire Ins. Co.,* 44 Cal.App.4th 1633 (1996).

In *Shell Oil*, a subcontractor's employee was injured at Shell's refinery and sued Shell and an engineer hired by Shell for negligence. *Id. at* 1638. The employee's claim was settled with contributions both from Shell and from the engineer's insurer. *Id. at* 1639. Shell sued the engineer for contractual indemnity but the court denied its claim due to a finding that Shell was solely negligent. *Id.* Shell then sued the engineer's insurer, which covered Shell as an additional insured but—like Sentry here—had exhausted its limit settling the employee's claim on behalf of the engineer alone. *Id.* The trial court "determined that Shell was entitled to $500,000 from [the engineer's insurer], half of its policy limit, with prejudgment interest ..." *Id.*

On the insurer's appeal, the court rejected the insurer's argument—the same as Sentry's here—that it had "fully performed its obligation ... by paying the policy limit, to fund [the engineer's] settlement ..., while leaving Shell to pay its own settlement out-of-pocket." *Id.* Instead, the insurer's "disbursement of its entire policy limits to indemnify [the engineer] did not discharge [the insurer's] policy obligations to Shell but rather constituted an actionable breach of those duties. The [trial] court's consequent award of damages equal to half the policy limits, conservative in view of Shell's sole negligence, is unexceptionable." *Id. at* 1647.

Here, instead of committing all or part of its limits toward Hutson's expiring statutory offer to Taylor, Sentry refused to commit anything to that offer and effectively reserved its full $2 million limits to later settle on behalf of its named insured, Alliance, alone.  And eventually Sentry did just that, exhausting its limits, along with money from Alliance's $25 million excess policy, to settle for Alliance.  (Nielsen decl. ¶¶11, 13; ECF 29, p. 7, ¶¶45, 46.)  Applied here, *Shell Oil* means that, at a minimum, Sentry breached its duty to Taylor to settle when—despite Sentry-hired defense counsel's evaluation (Nielsen decl. ¶¶ 5, 6)—Sentry refused to contribute any portion of its policy limits to meet the expiring statutory offer for its additional insured Taylor and instead later devoted them to settle for its named insured, Alliance.  (Nielsen decl. ¶¶ 10, 11, 13, Exh. A [Klawon letter].)  Sentry itself invoked *Shell Oil* and related cases to justify rejection of Hutson's offer for entry of judgment (*id.*, Exh. A), but this amounted to a legal fig leaf because *Shell Oil* instead required Sentry to share at least "half of the [$2 million] policy limits"—that is, $1 million—to help Taylor satisfy Hutson's judgment.

We say "at least" $1 million because the *Shell Oil* court found the additional insured, Shell, entitled to half ($500,000) of its engineer's $1 million policy **even though the engineer had no other insurance**.  In other words, even when the named insured was otherwise "bereft of coverage," *id. at* 1646 (quoting *Lehto v. Allstate Ins. Co.*, 31 Cal.App.4th 60, 75 (1994)), the defendant insurer was still required to split the policy limits between the two insureds.

But the cited *Lehto* case confirms that, if an insurer's named insured is not otherwise "bereft of coverage," an insurer in Sentry's position is free to devote its full limits to the additional insured.  The *Lehto* court made this point in distinguishing a different setting in which the other insured had excess insurance, noting that an insurer's "settlement on behalf of [its named insured] obviously did not leave its other insured … bereft of coverage" where "[a]dditional coverage was provided by the excess policy." *Lehto*, 31 Cal.App.4th at 75, fn.12 (cit.omitted).  In other words, in such a setting an insurer is free to pay out its full limits for one of its insureds because the other insured is fully protected by excess insurance.

So here.  Alliance had an additional $25 million in coverage through its excess policy with Federal (ECF 1 [complaint] ¶11, admitted ECF 28 [answer] ¶11).  Hutson's highest settlement

demand had been $23 million (Nielsen decl. ¶ 6), a figure Federal's policy by itself exceeded. Even if Sentry had devoted its limits to settling for Taylor, Alliance would have remained fully protected. Under *Shell Oil* and *Lehto*, Sentry should have satisfied the Hutson judgment against Taylor while leaving Alliance fully protected by Federal.

In this regard, one of the cases upon which Sentry earlier moved to dismiss, *Schwartz v. State Farm Fire & Cas.Co.*, 88 Cal.App.4th 1329 (2001) (ECF 12 at 17:12), supports Wesco, not Sentry. There, the Schwartzes and the Weinsteins were passengers in a car struck by an uninsured driver and both made claims for uninsured-motorist benefits under the Schwartzes' primary and excess policies. *Id. at* 1332-33. After an arbitration with the Weinsteins, the excess insurer paid out its whole limit to the Weinsteins, despite knowing "that the combined claims of the Schwartzes and Weinsteins would exceed the available limits under both primary and excess policies." *Id. at* 1334. Having been left bereft of coverage by the excess's payment to the Weinsteins, the Schwartzes sued the excess, alleging it "took no steps to reserve a proportionate share of the excess policy benefits in anticipation of the Schwartzes' claim …." *Id.* The *Schwartz* court agreed with the Schwartzes, reasoning that the insurer either should have sought "a negotiated agreement … as to a fair apportionment of the pool of funds" or should have "file[d] an interpleader action as other insurers do when faced with multiple claimants to a single fund." *Id. at* 1341.

Here, too, under both *Schwartz* and *Shell Oil*, Sentry's named insured Alliance faced no risk of becoming "bereft of coverage" and Sentry could have negotiated an apportionment of its $2 million in limits or availed itself of interpleader. Sentry knew of these options because its own denial letter cited *Executive Risk Specialty Ins. Co. v. Rutter Hobbs & Davidoff, Inc.*, 2012 WL 12878754 (C.D. Cal. 2012) (Nielsen decl., Exh. A; see also ECF 12 at 17:14), which was an "interpleader action involv[ing] a dispute over the distribution of the proceeds of a legal malpractice insurance policy among insureds and a third party judgment creditor." *Id. at* *1. There, the insured law "firm and several of its lawyers were named as defendants in four different lawsuits against different groups of attorneys" and "each claimed an interest in the proceeds available under those policies." And "because the claims potentially exceeded the policy limits," the insurer there—unlike Sentry here—"filed this interpleader action and deposited its policy with

the Court." *Id*. As noted earlier, Wesco repeatedly suggested "that Sentry interplead its limits and wash its hands of this matter" but Sentry never responded and inexplicably failed to do so. (Nielsen decl. ¶12, Exh. D.)

Nor could Sentry effectively argue that Hutson's offer of judgment against Taylor was "greater than Sentry's remaining aggregate policy limit." (ECF 12 at 17:26, citing ECF 1 at ¶¶ 20-21.) Wesco's letter to Sentry demanding that Sentry pay the proposed judgment against Taylor stated that, "[i]f Sentry contends that its limits have been impaired in any amount, please share evidence of such impairment, so that Wesco can consider making up the difference between such impairment and the statutory offer." (Nielsen decl. ¶7, citing ECF 19-1, p. 19 of 19.) Sentry never responded to this offer or produced any such evidence, compelling Wesco to act. (*Id.*)

At bottom, under *Shell Oil, Lehto*, and *Schwartz*, Sentry breached its contractual settlement duties to Taylor by reserving Sentry's entire $2 million to protect Sentry's named insured, Alliance, because (1) Sentry should have reserved at least half of those limits for Taylor even if Alliance had been otherwise uninsured and because (2), in fact, Alliance had $25 million in coverage beyond Sentry's policy, leaving Alliance fully protected even if the full limits of the Sentry policy were devoted to Taylor. Even if Sentry harbored doubts on these points, it could have simply interpleaded its limits to avoid liability. But it refused.

**5.     Sentry's allegation of failure of policy conditions fails under the insurer-breach rule.**

Sentry's counterclaim alleges that Wesco "voluntarily paid its limit in settlement for Taylor Houseman without Sentry's consent or involvement." (ECF 29 p. 9 ¶62, p. 29 of 477 [policy condition IV.2.d. ["No insured will ... voluntarily make a payment ... without our consent"]; see also ECF 28 [answer], p. 7, ¶10 [failure of conditions].)

This is nonsense because (1) Sentry has the facts wrong, (2) Sentry consented to entry of the judgment against Taylor, (3) Sentry's policy conditions are designed to prevent collusion, which plainly did not occur, and (4) Sentry's own breaches of its policy obligations prevent it from relying on its policy conditions.

To start with, then, Sentry's allegation of no "consent or involvement" is simply wrong. Sentry itself had "chosen Amber L. Kelly at the Walsworth firm to represent Taylor Houseman in this litigation." (ECF 29, Exh. D, p. 365 of 477.) Sentry's adjuster then "supervised the defense counsel Sentry hired to defend Taylor." (ECF 28 [Sentry answer], p. 4, ¶13, admitting complaint, ECF 1 ¶13.) As Sentry says, "Sentry, as the defending insurer, had the right to control defense and settlement of the Underlying Action." (ECF 12 at 18:19.) Ms. Kelly advised both Sentry and Wesco that the value of Hutson's claim and Taylor's liability exceeded the statutory offer. (Nielsen decl. ¶¶ 4, 6.) Wesco demanded that Sentry agree to pay the proposed judgment (ECF 19-1, Exh. C) and Sentry expressly refused. (Nielsen decl., Exh. A.) Ms. Kelly—supervised and controlled by Sentry—then accepted the statutory offer (ECF 29, p. 395 of 477) and a money judgment was entered against Taylor. (*Id.* p. 392 of 477.) Ms. Kelly was Sentry's own agent (see *Roche,* 51 Cal.App.5th at 797, and *Britz Fertilizers,* 2009 WL 604940 *2) and so Sentry itself constructively participated in signing the offer on Taylor's behalf. At any time, Sentry could have directed its attorney and agent Ms. Kelly not to sign the offer for entry of judgment.

Even if Sentry's agent had not signed, Sentry could not now argue that it never consented to entry of judgment against Taylor. "Implied consent is that manifested by signs, actions, or facts, or by inaction or silence, from which arises an inference that the consent has been given." *Wade v. Southwest Bank*, 211 Cal.App.2d 392, 405 (1962) (cit. omitted); see also, Cal. Civ. Code § 1589 ("voluntary acceptance of the benefit of a transaction is equivalent to a consent …"); *Id.* § 3516 ("Acquiescence in [alleged] error takes away the right of objecting to it.") Since Sentry consented, it cannot claim violation of its policy conditions.

Even if Sentry had not consented, moreover, its own legal theories on its policy conditions fall flat. Their purpose "is to prevent abuse, collusion and/or fraud against the insurer in the settlement of claims against an insured." *Continental Cas. Co. v. St. Paul Surplus Lines Ins. Co.*, 803 F.Supp.2d 1113, 1123 (E.D.Cal.2011). They do not apply where, as here, there is no "collusive attempt to enforce a stipulated judgment reached behind [an insurer's] back against [the insurer]." *Id.* Thus, for example, it does not apply where the defendant insurer has been "invited, twice, to participate" in discussions "but chose not to do so." *Id.* Instead, "it would be illogical to

argue that [the plaintiff insurer] should not have participated in settlement negotiations in the face of [the defendant insurer's] refusal to also participate, when failing to do so, and avoiding settling the … claim on [the insured's] behalf, would have left [the insured] exposed to a potential adverse judgment." *Id*. at 1124.

So here. Neither Wesco nor Taylor did anything to negotiate Hutson's offer for entry of judgment. Sentry-hired defense counsel simply recommended it, signed the acceptance to permit entry of judgment, and Sentry then refused to pay the resulting judgment. See, e.g., *Fuller–Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal.App.4th 958, 990 (2006) (an insurer may not "hover in the background of critical settlement negotiations and thereafter resist all responsibility on the basis of lack of consent"); accord, *Teleflex Medical Inc. v. National Union Fire Ins. Co.*, 851 F.3d 976, 984-985 (9th Cir. 2017). Indeed, the Ninth Circuit has found it "long established" that "'no action' and 'no voluntary payment' clauses do not create absolute rights to veto settlements." *Teleflex*, 851 F.3d at 986.

Moreover, "[s]uch provisions [policy conditions] are enforceable" only "in the absence of any breach by the insurer." Croskey, et al., Cal. Practice Guide: Insurance Litigation (Rutter 2025) ¶7:439.5; see, *Jamestown Builders, Inc. v. Gen. Star Indem. Co.*, 77 Cal.App.4th 341 (1999) ("California law enforces such no-voluntary payment provisions" only "in the absence of … insurer breach …"); *Critz v. Farmers Ins. Group,* 230 Cal.App.2d 788, 801-802 (1964)[3] ("The insurer's breach [of the duty to settle] so narrows the policyholder's duty of cooperation that the self-protective assignment does not violate it.").

Here, Sentry breached its settlement duty by ignoring its own hired counsel's evaluation that the value of Hutson's claims exceeded the amount of the statutory offer of judgment. (Nielsen decl. ¶¶ 4, 6.) "An unreasonable refusal to settle may subject the [primary] insurer to liability for the entire amount of the judgment rendered against the insured." *Hamilton v. Maryland Cas. Co.*, 27 Cal.4th 718, 724 (2002). This the *Hamilton* court treated as "liability for breach of contract." *Id.* at 725. "An insurer that breaches its duty of reasonable settlement is liable for all the insured's

---

[3] Disapproved on other grounds in *Crisci v. Security Ins. Co*., 66 Cal.2d 425, 433 (1967).

damages proximately caused by the breach, regardless of policy limits." *Id.* In that setting, an insured (or its subrogee) can bring "an action for reimbursement … when there is no denial of coverage or refusal to defend, but instead a refusal to settle." *Isaacson v. Cal. Ins. Guar. Assn.,* 44 Cal.3d 775, 792 and fn. 11 (1988). "[T]he breach of the insurer's obligation" sufficient to relieve the insured of policy conditions "occurs at the time when it indulges in the unwarranted rejection of a reasonable compromise offer." *Critz,* 230 Cal.App.2d at 797; see, *Shell Oil,* 44 Cal.App.4th at 1647 (payout of entire primary limits for one insured over another "constituted an actionable breach of those duties.") At bottom, Sentry had breached its duty to Taylor to accept a reasonable proposal as evaluated by Sentry-hired defense counsel.

Sentry is thus barred from raising its policy conditions as a defense.

**6.       By subrogation to Taylor's rights, Wesco may recover from Sentry the payment Wesco made to satisfy the Hutson judgment.**

"Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim." *Fireman's Fund Ins. Co. v. Maryland Cas. Co*., 65 Cal.App.4th 1279, 1291 (1998). A subrogated excess insurer like Wesco "is said to 'stand in the shoes' of its insured," such as Taylor. *Id.* at 1292. Thus, "upon payment of the insured's liability to the injured claimant, the excess insurer is equitably subrogated to the rights of the insured against the primary insurer, including his right of action for bad faith failure to settle." *Northwestern Mut. Ins. Co. v. Farmers' Ins. Group*, 76 Cal.App.3d 1031, 1040 (1978). Here, Wesco "stand[s] in the shoes" of Taylor and thereby assumes Taylor's claim against Sentry for refusing to settle the Hutson lawsuit or pay the Hutson judgment. *Shell Oil,* 44 Cal.App.4th at 1647(illustrating additional insured's right to claim breach in this setting.)

Wesco has shown that Sentry's policy became primary and Wesco's excess in the "specific event situation" where Taylor qualified as an additional insured under the Sentry policy. *See ante* Point 2. Wesco has shown that Sentry was required to indemnify Taylor against a products-liability lawsuit arising out of defects in Alliance's washing machine. *See ante* Point 1. And Wesco has shown that none of Sentry's narrow exclusions apply. *See ante* Point 3. Sentry, not Wesco, was the primary insurer responsible for judgment entered against Taylor. Yet Sentry refused to pay any

amount toward the judgment.  This left Wesco with no option but to pay out its $1 million in limits to protect Sentry's insured, Taylor, and to protect Wesco from liability to Taylor (or another subrogee) for failing to do so.

Wesco is entitled to recover not only that $1 million but also prejudgment interest.  State law governs prejudgment interest in a diversity action such as this.  *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1139 (9th Cir. 2011).  Under California law, one "entitled to recover damages certain …is entitled also to recover interest thereon …."  Cal. Civ. Code § 3287, subd. (a); § 3289, subd. (b) [rate on contracts is 10%]; see *Wisper Corp. v. California Commerce Bank*, 49 Cal.App.4th 948, 958 (1996).  The 10% rate under section 3289 has been held to apply in this very setting to an equitable claim by an insurer found to be excess for full reimbursement against a second insurer found to be the sole primary.  *Westport Ins. Co. v. Cal. Casualty Mgt. Co*., 916 F.3d 769, 781-782 (9th Cir. 2019).

The Court therefore should grant this motion and order entry of judgment of the $1 million Wesco paid to satisfy the Hutson judgment, plus prejudgment interest at 10% from the satisfaction of judgment filed September 12, 2025.  (ECF 19-1, p. 15 of 19.)

## CONCLUSION

Sentry, recognizing its status as primary insurer for Taylor under an additional-insured vendors endorsement to Sentry's policy, controlled Taylor's defense of Hutson's lawsuit throughout.  Sentry's retained defense attorney evaluated Taylor's liability at a sum well above Sentry's $2 million limit of insurance.  When confronted with a longstanding but expiring statutory offer for entry of judgment and demands to accept the offer and pay the judgment, Sentry refused, citing its duty to protect its named insured, Alliance, but ignoring that Alliance had another $25 million in excess insurance.  In that setting, the California decisions in *Shell Oil, Lehto,* and *Schwartz* required Sentry to accept the offer and pay the judgment, thereby protecting Taylor, while leaving Alliance fully protected by its $25 million in additional insurance.  Sentry's breach of its duties to settle and to indemnify the judgment forced Wesco to pay its limits to satisfy the judgment.  Sentry then compounded its breach by rejecting Wesco's urging that Sentry interplead

its limits, a process that should have exonerated Sentry, and instead paying them out to protect Alliance alone.  At this point, then, Wesco's sole remedy is against Sentry, in subrogation to Taylor's rights, for breach of Sentry's policy obligations to Taylor.

Wesco therefore asks the Court to grant this motion, issue a summary judgment against Sentry awarding Wesco $1 million, or in such other amount the Court concludes appropriate, [4] plus prejudgment interest.

Respectfully submitted,

February 14, 2026                          NIELSEN KATIBAH LLP

By:       /s/ James C. Nielsen
          James C. Nielsen
          Attorneys for Plaintiff Wesco Ins. Co.

---

[4] If the Court finds a different figure appropriate under the undisputed facts here, the Court has discretion to adjust the award accordingly.  See also, Wesco's third claim for declaratory judgment under 28 U.S.C. § 2201; *Eureka Fed. Sav. & Loan Assoc. v. American Cas. Co.*, 873 F.2d 229, 231 (9th Cir. 1989); *Travelers Indem. Co. v. Lexington Ins. Co.*, 2024 WL 1485861 *4 (N.D.Cal., Apr. 5, 2024).